# EXHIBIT 12

To

Memorandum In Support of TriPath Imaging, Inc.'s Motion to Exclude
Defenses Based on Cytyc's CDS-1000

Civil Action No. 03-11142 [DPW]  - Lead Case

Filed May 5, 2005

Westlaw.

Not Reported in F.Supp.2d                                                                          Page 1
2003 WL 1610781 (D.Minn.)
**(Cite as: 2003 WL 1610781 (D.Minn.))**

# H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Minnesota.
EZ DOCK, INC., Plaintiff,
v.
SCHAFER SYSTEMS, INC., et al. Defendants.
**No. Civ.98-2364(RHK/AJB).**

March 8, 2003.

Daniel J. Maertens and Lora Esch Mitchell, Fredrikson & Byron, P.A., Minneapolis, Minnesota; and McPherson D. Moore and Ned W. Randle, Polster, Lieder, Woodruff & Lucchesi, L.C., Saint Louis, Missouri, for Plaintiff.

Douglas J. Williams, Jon Trembath, and William F. McIntyre, Jr. Merchant & Gould, P.C., Minneapolis, Minnesota, for Defendants.

MEMORANDUM OPINION AND ORDER

KYLE, J.

## Introduction

\*1 Plaintiff EZ Dock, Inc. alleges that Defendants Schafer Systems, Inc. and Connect-A-Dock, Inc. (collectively, "Defendants" or "Schafer") have, through their manufacture and sale of the Model 1000 and Model 2000 "Connect-A-Dock" floating docks and the Defendants' corner dock sections, infringed multiple claims of United States Patent No. 5,281,055 (hereinafter "the '055 patent"), which describes a floating dock comprised of one or more uniform sections that can be coupled together to make an endless combination of formations. For their part, Defendants deny that their products infringe the '055 patent, either literally or under the doctrine of equivalents. Defendants further contend that (1) the invention disclosed in the '055 patent was reduced to practice and sold more than one year prior to the filing of the application for the patent, rendering the patent invalid, (2) the invention claimed in the '055 patent is obvious in light of a combination of prior art references and therefore invalid, (3) the invention was anticipated by one of four earlier patents and is therefore invalid, and (4) the patent is unenforceable

due to inequitable conduct before the Patent and Trademark Office ("PTO").

Before the Court are the parties' Motions in Limine. EZ Dock has brought ten motions; Schafer has brought one. Several of the motions involve the admissibility of expert testimony under Federal Rules of Evidence 702 and 703 and the Supreme Court's decisions in *Daubert v. Merrill Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), and its progeny. The Court begins with the motions relating to expert testimony.

### I. Motions in Limine Relating to Expert Testimony
*A. General Principles*

The admissibility of expert testimony and the qualifications of a witness to testify as an expert are preliminary questions that the district court must determine. Fed.R.Evid. 104(a). The proponent of the proposed expert testimony bears the burden of demonstrating by a preponderance of the evidence that it is admissible. *See Daubert,* 509 U.S. at 592 & n. 10; *Bourjaily v. U.S.,* 483 U.S. 171, 175-76 (1987); *Lauzon v. Senco Prods. Inc.,* 270 F.3d 681, 686 (8th Cir.2001).

Effective December 1, 2000, Rule 702 was amended to add language consistent with the holdings from a line of Supreme Court opinions regarding expert testimony that began with *Daubert.* [FN1] As amended, Rule 702 provides that

> FN1. At the time this action was commenced, Rule 702 provided that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise." Fed.R.Evid. 702 (2000).

[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 1610781 (D.Minn.)
**(Cite as: 2003 WL 1610781 (D.Minn.))**

Page 2

principles and methods, and (3) the witness has applied the principles and methods reliably to the facts.

Fed.R.Evid. 702 (2001) (emphasis added).

**\*2** Under both *Daubert* and the amended Rule 702, the trial judge is charged with a "gatekeeper function," the objective of which is to ensure the reliability and relevance of the expert testimony admitted into evidence. *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 149 (1999). The court ensures the *relevance* of proposed expert testimony by evaluating whether the opinions offered are sufficiently tied to the facts of the case, *see Daubert,* 509 U.S. at 591, and ensures the *reliability* of such testimony by considering a number of non-exclusive factors, such as "(1) whether the theory or technique can be (and has been) tested, (2) whether the theory has been subjected to peer review and publication, (3) the known or potential rate of error, and (4) whether the theory has been generally accepted." *Peitzmeier v. Hennessy Indus., Inc.,* 97 F.3d 293, 297 (8th Cir.1996) (quoting *Daubert,* 509 U.S. at 593-94). Other factors pertinent to assessing the reliability of expert testimony have evolved from *Daubert'*s progeny, including "whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case." *Lauzon, 270 F.3d at 687.*

Although the Supreme Court in *Daubert* stated that the focus of the trial court's gatekeeping inquiry "must be solely on principles and methodology, not on the conclusions they generate," 509 U.S. at 595, the Court later acknowledged that "conclusions and methodology are not entirely distinct from one another." *General Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997). "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.* Thus, the district court may evaluate whether the studies or data upon which the expert relies are sufficient, either individually or in combination, to support the conclusions and opinions being advanced, there being "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Id.*

The ultimate goal of the trial court's "gatekeeping" inquiry is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire,* 526 U.S. at 152. To accomplish that "gatekeeper function," the trial court has discretion in deciding *how* to evaluate the reliability of the expert testimony and *whether* the expert's relevant testimony is reliable. *Id.* In evaluating the admissibility of expert testimony, the trial court must also be mindful that "[v]igorous cross-examination [and the] presentation of contrary evidence ... are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596. This last observation reflects the fundamental principle that Rule 702 is generally one of inclusion rather than exclusion.

### B. Defendants' Motion to Exclude Testimony of Arthur H. Cobb Re: Lost Profits Analysis and Reasonable Royalty Analysis

**\*3** Arthur H. Cobb is EZ Dock's damages expert. (Pl.'s Trial Brief at 20.) Cobb is a certified public accountant who has been engaged for almost thirty years in providing professional services in financial matters, with emphases in the areas of litigation support and capital finance. (McIntyre Aff. Ex. 1 at 35.) He has held engagements regarding the estimation and evaluation of lost profits and economic damages in business litigation (including reasonable royalties) and has held engagements regarding the recreational boat industry. (*Id.*)

Schafer moves to exclude Cobb's testimony with respect to two main areas: (1) his determination of damages measured by a "lost profits" analysis, and (2) his determination of damages using a reasonable royalty analysis. Defendants criticize Cobb's analysis of "lost profits" on the grounds that it lacks sound economic evidence of the nature of the market and likely outcomes with infringement factored out of the picture. Specifically Defendants complain that Cobb's "lost profits" analysis fails to analyze the demand for the patented features of EZ Dock's product that are at issue in this litigation and improperly relies on the unsupported opinions of another expert regarding the absence of acceptable, non-infringing alternatives to EZ Dock's. Defendants criticize Cobb's "reasonable royalty" analysis for failing to address many aspects of the framework set out in the seminal case of *Georgia Pacific Corp. v. U.S. Plywood Corp.,* 318 F.Supp. 1116 (S.D.N.Y.1970).

Upon a finding of infringement, Title 35 permits an award of "damages adequate to compensate for the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 1610781 (D.Minn.)
(Cite as: 2003 WL 1610781 (D.Minn.))

Page 3

infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284. The party establishing infringement of a patent can recover lost profits as its damages if it proves that, "but for" the infringement, it reasonably would have made the additional profits enjoyed by the infringer. See *King Instruments Corp. v. Perego,* 65 F.3d 941, 952 (Fed.Cir.1995). The successful plaintiff "may resort to any method showing, with reasonable probability, entitlement to lost profits 'but for' the infringement." *Micro Chemical, Inc. v. Lextron, Inc.,* 318 F.3d 1119, 1122 (Fed.Cir.2003) (citing *King Instruments,* 65 F.3d at 952.) The Court begins its analysis of Schafer's motion in limine with the issue of "lost profits."

*1. Lost Profits*

Proof of an entitlement to lost profits calls for a two-step analysis. First, the patentee must establish the reasonableness of an inference that, "but for" the infringement, it would have made the additional profits enjoyed by the infringer. *Micro Chemical, Inc.,* 318 F.3d at 1122. The burden then shifts to the infringer to show that the inference is unreasonable as to some or all of the lost profits. *Id.* There are two recognized methods of showing "but for" causation: the four-factor test set out in *Panduit Corp. v. Stahlin Bros. Fibre Works,* 575 F.2d 1152, 1156 (6th Cir.1978), and the two-supplier market test. *Micro Chemical,* 318 F.3d at 1122; *see also Lam, Inc. v. Johns-Manville Corp.,* 718 F.2d 1056, 1065 (Fed.Cir.1983).

*4 Cobb describes the dock industry as including both fixed and floating docks made from a variety of materials, including but not limited to concrete, wood, polystyrene, aluminum, and polyethylene. (McIntyre Aff. Ex. 1 at 6.) Thus, part of the dock industry involves floating docks; a segment that comprises large companies, small manufacturers, and many one-person operations. (*Id.*) Cobb asserts that "[t]he majority of the total dollar value of the dock industry is estimated to be generated by less than six companies." (*Id.*) According to Cobb, EZ Dock competes in the floating dock segment of the industry with, *inter alia,* Schafer and Connect-A-Dock; Jet Dock Systems, Inc.; CanDock, Inc.; and ShoreMaster. (*Id.* at 7.)

Framing his analysis around the "but for" causation factors set forth in *Panduit,* Cobb considers four issues relevant to determining whether alleged lost profits were caused by infringement: (1) the existence of a demand for the patented product, (2) the absence of available, non-infringing substitutes, (3) the patent holder's manufacturing and marketing capability to exploit the demand, and (4) the amount of profit the patent holder would have made. See *Panduit,* 575 F.2d at 1156. With respect to the first factor, Cobb opines that "[d]emand for EZ Dock's floating dock and related products are [sic] substantiated by EZ Dock and by Connect-A-Dock product sales." (McIntyre Aff. Ex. 1 at 19.) After summarizing Connect-A-Dock's sales from 1998 through May 31, 2002, Cobb states that "Connect-A-Dock revenues were assumed to be net of discounts, returns and allowances, freight, and sales commissions." (*Id.*)

For the second *Panduit* factor, Cobb's analysis consists, *in toto,* of the following:
EZ Dock and Connect-A-Dock products exist in a two-supplier market and directly compete for the same customers. C. Allen Wortley determined and opined that no acceptable non-infringing alternatives to the EZ Dock patented product exist. We assume that EZ Dock would have captured all Connect-A-Dock sales.

(*Id.*) At the end of his expert report, Cobb lists the data and other information considered. (Id. at 32-34.) Nowhere in that three-page list does Cobb specifically identify the expert report of C. Allen Wortley.

The difficulties with Cobb's proposed expert opinions are illustrated by his deposition testimony. Asked what he relied on for his opinion that a purchaser buys a dock from either EZ Dock or Defendants because it has "pylon" structures on the underside that assist with floatation and structural rigidity, Cobb responds as follows:
A: In that regard I'm relying on the analysis, considerations and opinions of Mr. Wortley.
Q: What have you done to see if he's done the proper analysis?
A: I've not--I've not done anything specific in that regard. I've read his material and relied on his material but I've not undertaken an independent investigation or analysis on that.
*5 Q: The material you reviewed, in all the material that you reviewed, do you recall anything anywhere suggesting that a dock was purchased because it had a conical or frustoconical space underneath the dock?
A: Not specifically.
(McIntyre Aff. Ex. 2 at 18.) Regarding the existence of a two-supplier market, Cobb testified as follows:
Q: Am I correct that you rely upon Dr. Wortley's statement that there are two suppliers in the market, only two suppliers in the market and that -

Not Reported in F.Supp.2d
2003 WL 1610781 (D.Minn.)
(Cite as: 2003 WL 1610781 (D.Minn.))

Page 4

A: Two suppliers with the particular feature and the importance of that feature, yes.
Q: And because of that you don't need to do any type of elasticity analysis?
A: Yes.
(Id. at 33-34.)

In his expert report, therefore, Cobb has not himself formed an opinion as to the existence of a "two-supplier" market; he has simply adopted Wortley's opinion regarding the nature of the market. This adoption is problematic, however, given Cobb's earlier observation that EZ Dock competes in the floating dock segment of the market with at least *four* companies, including Schafer/Connect-A-Dock. Furthermore, Defendants have presented evidence that Wortley himself doubts that every EZ Dock product that is purchased has been purchased because it has the "pylon" structure. (McIntyre Aff. Ex. 3 at 100.) Wortley further testified as follows:

Q: ... Did you do any research to see why people purchased the EZ Dock system?
A: No.
Q: Did you do any research to see why people purchased the Connect-A-Dock system?
A: No.
Q: Do you believe that every dock sold by Connect-A-Dock would have been sold by EZ Dock?
A: No.
(Id. at 101.)

Cobb has failed to account for the effect of competition from other companies that manufacture floating docks, such as CanDock, JetDock Systems, and ShoreMaster. *See Children's Broadcasting Corp. v. Walt Disney Co.*, 245 F.3d 1008, 1018 (8th Cir.2001) (excluding expert testimony on damages where expert failed to consider the effect of competition by others in industry). Furthermore, Cobb does not explain why it is reasonable to assume that EZ Dock would capture all Connect-A-Dock sales. His proposed opinions regarding the existence of a demand for the patented product and the absence of non-infringing alternative products is not "based upon sufficient facts or data" as required by Rule 702.

This case is distinguishable from *Micro Chemical, Inc v. Lextron, Inc.*, 317 F.3d 1387 (Fed.Cir.2003) (*"Lextron I"*), on which EZ Dock relies for the admissibility of Cobb's testimony. In *Lextron I*, the defendants challenged the admissibility of expert opinion testimony on the grounds that it was not based on "reliable facts." The parties in *Lextron I*

hotly disputed many of the facts relevant to a reasonable royalty analysis, leading the Federal Circuit to caution that, "[w]hen ... the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony." 317 F.3d at 1392.

*6 In this case, by contrast, Cobb's expert report points to *no* facts that underlie his proposed testimony regarding either the demand for the patented product, the availability of non-infringing alternatives, or the nature of the market as a two-supplier market. The Defendants cannot subject Cobb's proposed testimony on those factors to "vigorous cross-examination" because Cobb himself does not purport to know anything about those subjects; he has deferred to Wortley's analysis and opinions. With respect to Cobb's opinions regarding "lost profits" the Court concludes that "there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146. In neither his expert report nor his deposition could Cobb identify a reliable factual basis for his opinions regarding the demand for the patented product or the existence of available non-infringing alternatives.

EZ Dock has failed to meet its burden of proving that Cobb's proposed expert testimony satisfies the criteria of Federal Rule of Evidence 702. Accordingly, the Court will grant Defendants' motion with respect to Cobb's testimony regarding lost profits.

*2. Reasonable Royalty Analysis*

Defendants also challenge the admissibility of Cobb's determination of a 20% " reasonable royalty" rate on the grounds that he has failed to address several factors relevant to the analysis set out by the *Georgia Pacific* case and has also failed to account for a "commonly-used 25% 'rule of thumb' method" as the starting point of his analysis. Defendants further complain that Cobb has failed to factor in the established licensing practices in the industry, which Defendants contend are in the range of 1% to 5%. The Court concludes that any shortcomings in Cobb's "reasonable royalty" analysis go to the weight rather than the admissibility of his analysis, and are more appropriately the subject of cross-examination than a motion to exclude and go more to the weight than the admissibility of his testimony. Accordingly, the Court will deny the Defendants' motion with respect to Cobb's proposed expert testimony regarding a "reasonable royalty" rate.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 1610781 (D.Minn.)
(Cite as: 2003 WL 1610781 (D.Minn.))

Page 5

*C. EZ Dock's Motion to Exclude Evidence and Testimony from Glenn L. Beall*

Glenn Beall has worked in the plastics industry since receiving his bachelor of science degree in 1957, and has worked with the rotational molding process since 1963. (Mitchell Aff. Ex. 1 at 1.) He teaches rotational molding and has published several articles and books in the field. (*Id.*) He indicates having an understanding of patents, but acknowledges that he is not a patent attorney. (*Id .*)

EZ Dock moves to exclude any testimony of Glenn L. Beall relating to "the skill of rotomolding, plastic dock design, patent infringement, patent validity, the state of the law, legal conclusions, patent office procedures, or any other related matter." (Pl.'s Mot. in Limine to Exclude Evid. and Testimony of Beall at 1.) EZ Dock argues that Beall lacks the necessary background or experience in "the areas of science ... which are crucial to the case at bar, namely the design and manufacture of floating plastic docks," and is therefore incompetent under Rule 702 to provide expert testimony in this case.

*7 EZ Dock's current argument stands in sharp contrast to the assertions EZ Dock made in the context of the *Markman* hearing: namely, that a person of ordinary skill in the art of dock design and construction is someone who has a high school education and has no experience in rotational molding. (Pl.'s Initial Markman Brief at 11.) Accepting as true EZ Dock's representation of who constitutes a person of ordinary skill in the art, it is clear that, far from being unqualified to testify, Beall is overqualified. Furthermore, the specification of the '055 patent recommends a preferred embodiment in which the docking members are made of "specialized molded polyethylene"; i.e., a type of plastic. Beall qualifies as an expert in the manufacture of plastic items through rotational molding. Therefore, Beall should be allowed to offer expert testimony on rotational molding and the design and manufacture of plastic items, to the extent those subjects are relevant to the questions the jury must resolve.

With respect to Beall's ability to testify about patent law or claim interpretation, EZ Dock's arguments are more well-taken. Beall's expert report indicates that he is not qualified to provide expert testimony on the operations of the PTO or how to construe claims. Furthermore, issues of law are not properly the subject of expert testimony. It is the *Court's* duty to instruct the jury on the applicable principles of patent law, just as claim construction is an issue for the

*Court* and not the jury. The Court has already construed the claims at issue in the January 22, 2003 *Markman* Order. At the hearing on the motion in limine regarding Beall, counsel for the Defendants represented that Beall will not testify regarding claim construction, such as the language from the claims at issue requiring the pylons to extend from the top surface to the bottom surface of the docking member. Nor will Beall purport to testify about patent law. Accordingly, that aspect of EZ Dock's argument appears to be moot.

Finally, with respect to issues of patent infringement and validity, Defendants persuasively argue that Beall, as a person experienced in the manufacture of plastic devices through rotational molding, is adequately qualified to compare elements of the '055 patent with elements of the accused products to assist the jury in determining whether they are equivalent or perform substantially the same function in substantially the same way to obtain substantially the same result. Accordingly, Beall will be allowed to testify to facts pertaining to the comparison of the patent-in-suit to the accused products or to prior art references.

*D. EZ Dock's Motion to Exclude Evidence and Testimony from Brian Pingel*

Brian Pingel has served as patent counsel for Schafer in connection with the Connect-A-Dock products from at least late 1997. In December 1997 and January 1998, prior to the start of this lawsuit, Pingel sent letters to Schafer stating his opinions as to whether the design for a floating dock system that Schafer was developing infringed the '055 patent. (Mitchell Aff. Exs. A & B.) Also prior to this lawsuit, in response to a letter from EZ Dock's counsel demanding that Schafer cease and desist with the manufacture and sale of its floating dock product, Pingel wrote to EZ Dock's counsel challenging whether in fact Schafer's product infringed the '055 patent. (*Id.* Ex. C.) Finally, since this lawsuit began, Pingel has written letters to dealers and potential purchasers of Connect-A-Dock products (*id.* Exs. D, E, & G), and has written an additional opinion letter in light of the PTO's issuance of a re-examination certificate adding additional claims (*id.* Ex. F). Finally, in light of the Supreme Court's decision in *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,* Pingel wrote a letter to Schafer explaining the case's impact on his prior opinion letters. (*Id.* Ex. H.)

*8 EZ Dock moves to exclude any evidence or testimony from Pingel "regarding matters outside the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 1610781 (D.Minn.)
(Cite as: 2003 WL 1610781 (D.Minn.))

Page 6

contents of his non-infringement letters"; i.e., the letters of December 1997 and January 1998. (Pl.'s Mot. in Limine to Exclude Letters of Pingel and Evid. and Testimony Re: Same at 2.) EZ Dock argues that Defendants did not identify Pingel as an expert witness or produce an expert report from him; therefore, the Court should not allow him to offer opinion testimony on issues such as the validity of the '055 patent, its enforceability, claim construction, or other areas of patent law. The Court concurs with EZ Dock's observation that Pingel can be called only as a fact witness, not as an expert witness. Accordingly, Defendants are cautioned that Pingel's testimony shall be confined to the facts--e.g., what he did, said, or wrote--that are relevant to the issue of willful infringement.

Turning to the admissibility of the letters, the Court begins with Pingel's March 15, 2002 letter to Defendants regarding his review of the reexamination certificate issued by the PTO on the '055 patent. EZ Dock has not adequately explained why this opinion letter, generated in light of the fact that EZ Dock had obtained a re-examination certificate adding additional claims, and in light of the fact that EZ Dock amended its Complaint to assert infringement of those new claims, should be treated substantially differently from Pingel's opinion letters regarding non-infringement of the patent as originally issued. With respect to the March 15, 2002 letter, EZ Dock's motion in limine will be denied. [FN2]

> FN2. The Court does not here attempt to address any other objections EZ Dock may have to the admissibility of the March 15, 2002 letter.

The February 26, 1998 letter to EZ Dock's counsel reflects Pingel's position prior to the start of litigation regarding the non-infringement of the '055 patent by the Connect-A-Dock design. EZ Dock has not established a basis for excluding that letter. Accordingly, the Court will deny the motion in limine with respect to that letter as well.

Turning to letters Pingel sent to Connect-A-Dock dealers and potential purchasers--Exhibits D, E, & G to Mitchell's Affidavit--the Court concludes that those letters are not relevant to the question of willful infringement. Rather, they seek to communicate Defendants' litigation position to third parties who are aware of the lawsuit. As such, they have no bearing on the Defendants' intent in engaging in the manufacture and sale of the accused products after conducting due diligence on the question of

infringement. Pingel's letters dated December 2, 1999, April 3, 2001, and April 29, 2002 are not admissible. Finally, Defendants have failed to establish how Pingel's July 9, 2002 letter to Defendants regarding the *Festo* decision--Exhibit H to Mitchell's Affidavit--is relevant to or admissible on the issue of willfulness.

The Court will grant in part EZ Dock's motion with respect to the letters dated December 2, 1999, April 3, 2001, April 29, 2002, and July 9, 2002. The letters shall not be introduced into evidence, nor shall Pingel nor any other defense witness testify as to their contents or the circumstances surrounding them.

*E. EZ Dock's Motion to Exclude Testimony from Kent A. Herink Re: State of Patent Law or Legal Conclusions*

**\*9** Kent Herink has practiced as a patent attorney for over twenty years. He holds both a Bachelor of Arts degree and a Masters of Science degree in physics. In Herink's "Updated Expert Witness Statement," dated August 14, 2002, he anticipates being called to testify on "a variety of matters regarding [PTO] practice and procedures, both in general and as they apply to this case." Herink expresses his opinions as to the proper construction of the claims at issue in this litigation. He also states opinions as to the invalidity of the '055 patent on several theories, including anticipation and failure to disclose the best mode. In his "Updated" statement, Herink also opines as to the enforceability of the patent due to inequitable conduct before the patent office.

In September 2002, Herink signed a "Supplemental Expert Witness Statement" that contains opinions that the Connect-A-Dock products do not literally infringe the '055 patent and that the doctrine of equivalents is unavailable to EZ Dock because of prosecution history estoppel. Herink also offers opinions on the issue of willful infringement in response to the expert report of Thomas J. Nikolai.

EZ Dock moves to preclude Herink from testifying as to "the legal standards of claim interpretation, patent infringement, patent validity, or patent enforceability, or his legal conclusions based on his understanding of the law." (Mot. in Limine to Exclude Opinion Test. of Kent Herink at 1.) Based on the issues framed by EZ Dock's motion in limine and the representations made at the hearing on the motions in limine, the Court concludes that EZ Dock has no objection to Herink testifying about PTO practices and procedures or the reasonableness of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 1610781 (D.Minn.)
**(Cite as: 2003 WL 1610781 (D.Minn.))**

Pingel's opinion letters. Accordingly, Herink shall be free to testify as to those matters.

EZ Dock's objections to testimony concerning claim construction are well taken. Herink shall not testify regarding the correct interpretation of the patent claims. It is beyond dispute that
> [a] determination of infringement requires a two-step analysis. "First, the court determines the scope and meaning of the patent claims asserted ... [Second,] the properly construed claims are compared to the allegedly infringing device." *Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1454, 46 USPQ2d 1169, 1172 (Fed.Cir.1998) (en banc) (citations omitted). Step one, claim construction, is an issue of law, *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 970-71, 34 USPQ2d 1321, 1322 (Fed.Cir.1995) (en banc), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).... Step two, comparison of the claim to the accused device, requires a determination that every claim limitation or its equivalent be found in the accused device. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 29, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). Those determinations are questions of fact. *Bai v. L & L Wings, Inc.,* 160 F.3d 1350, 1353, 48 USPQ2d 1674, 1676 (Fed.Cir.1998).
> **\*10** *Transclean Corp. v. Bridgewood Servs., Inc.,* 290 F.3d 1364, 1370 (Fed.Cir.2002) (emphasis added). Herink similarly will not be permitted to explain to the jury or otherwise testify regarding prosecution history estoppel or its interface with the theory of infringement under the doctrine of equivalents.

Furthermore, having reviewed Herink's proposed opinions regarding patent invalidity and unenforceability, the Court finds in them nothing that satisfies the prerequisite of Rule 702: that his "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." The Court rejects Defendants argument that Herink's "specialized knowledge" as a patent attorney will help the jury understand the various statutory requirements for obtaining a valid and enforceable patent and the duties of an applicant in the patenting process. These are issues of law on which the Court will instruct the jury. Herink shall not inform the jury about the legal requisites of patentability. Likewise, Herink shall not inform the jury about the methods of proving infringement.

As for Defendants' argument that Herink should be

allowed to opine on "ultimate issues," such as whether the '055 patent has been infringed or is valid or enforceable, the Court finds Herink's opinions to be little more than an *ipse dixit* that is insufficiently tied to the facts of the case. For example, after relaying his understanding of various facts pertaining to Plaintiff's alleged purchase of dock sections from Winnebago, the manufacturer, more than one year prior to the patent application, Herink "opines" as follows: "if the order of approximately 100 dock members from Winnebago was a commercial offer for sale, or the sale and delivery of approximately 64 dock members from Winnebago to Plaintiff was a commercial sale, at least claims 8, 9, and 13-20 of the patent-in-suit are invalid." (Herink Updated Expert Witness Statement at 5.)

Herink's proposed opinions are little more than assertions that "if X is found (presumably by the jury), then the patent is invalid/ unenforceable/ not infringed." The same statements could (and the Court expects, will) be made by counsel in closing arguments. Herink's proposed testimony does not assist the jury in making findings on the factual questions it must decide. The Defendants effectively conceded at the motion in limine hearing that such opinion testimony from Herink is not proper and would not be offered at trial. [FN3] EZ Dock's motion will be granted.

> FN3. As discussed with counsel at the hearing, the Court is not precluding Defendants from raising similar objections to testimony from Plaintiff's "patent law" expert, Nikolai.

*F. EZ Dock's Motion to Exclude Evidence and Testimony from Herink not Previously Disclosed*

EZ Dock also moves to preclude Herink from testifying as to any matters not previously disclosed in his expert reports, specifically any opinion testimony regarding the PTO's re-examination of the '055 patent. EZ Dock contends that Rule 26 of the Federal Rules of Civil Procedure requires Herink to limit his expert testimony to the contents of his expert reports, and the expert reports Herink provided as of thirty days before trial did not address the re-examination of the '055 patent.

**\*11** Under Rule 26(e)(1), parties have a duty to supplement disclosures made pursuant to Rule 26(a). With respect to expert disclosures made pursuant to Rule 26(a)(2)(B)--such as the expert witness statements Herink prepared--"the duty extends both

Not Reported in F.Supp.2d
2003 WL 1610781 (D.Minn.)
**(Cite as: 2003 WL 1610781 (D.Minn.))**

Page 8

to information contained in the report and to information provided through a deposition of the expert, and *any additions or other changes to this information shall be disclosed by the time the party's disclosures under* Rule 26(a)(3) *are due."* Fed.R.Civ.P. 26(e)(1) (emphasis added). In this case, the Rule 26(a)(3) pretrial disclosures of witness lists and exhibit lists were due on February 20, 2003. Defendants respond to EZ Dock's motion by pointing out that Herink supplemented his expert report, in light of the Court's January 22 *Markman* Order, shortly before the pretrial submissions were due. Herink's supplemental expert report is timely under Rule 26(e)(1). EZ Dock's motion will be denied.

### II. EZ Dock's Other Motions in Limine
*A. EZ Dock's Motion to Exclude Evidence and Testimony Regarding Schafer's Earlier Motion for Summary Judgment Based on the On-Sale Bar of § 102(b)*

The parties agree that there is no need for either party to introduce evidence or testimony regarding either the trial court's granting of Defendants' earlier motion for summary judgment or EZ Dock's success on appeal to get that decision overturned. Accordingly, the Court will grant this motion.

*B. EZ Dock's Motion to Preclude Evidence or Testimony of Defendants' Own Patents*

EZ Dock has not identified the specific patents subject to its motion; Defendants have apparently obtained, however, at least two patents in connection with floating docks. EZ Dock complains that Defendants will try to "take advantage of a common misconception by the public that a patent grants an affirmative right to make the patented article." (Pl.'s Mot. to Preclude Evid. or Test. of Defs.' own Patents at 1.) Therefore, it claims, the evidence of Defendants' patents must be excluded.

Defendants also do not identify the patents at issue in this motion. They respond generally that the PTO's decision to issue patents to them rebuts EZ Dock's claim of willful infringement because Defendants cannot have *copied* EZ Dock's product and still have obtained patents on their connector design and support structure. As none of the claims at issue have anything to do with the connector design, Defendants' possession of a patent on that feature is irrelevant to the issue of infringement. As for the "support structure," Defendants do not explain what this feature entails or how it relates to the claims at issue. Accordingly the Court will grant the motion,

pursuant to Rules 402 and 403, as to any patents held by Defendants.

*C. EZ Dock's Motion to Exclude Evidence and Testimony Inconsistent with the Court's Claim Construction*

EZ Dock complains that Defendants is going to introduce evidence and testimony at trial suggesting that the jury may interpret the claims at issue in a way inconsistent with the Court's claim construction. As set forth above, the determination of whether a patent is infringed is a two step process:

**\*12** "First, the court determines the scope and meaning of the patent claims asserted ... [Second,] the properly construed claims are compared to the allegedly infringing device." *Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1454, 46 USPQ2d 1169, 1172 (Fed.Cir.1998) (en banc) (citations omitted). Step one, claim construction, is an issue of law, *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 970-71, 34 USPQ2d 1321, 1322 (Fed.Cir.1995) (en banc), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).... Step two, comparison of the claim to the accused device, requires a determination that every claim limitation or its equivalent be found in the accused device. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 29, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). Those determinations are questions of fact. *Bai v. L & L Wings, Inc.,* 160 F.3d 1350, 1353, 48 USPQ2d 1674, 1676 (Fed.Cir.1998).

*Transclean Corp.,* 290 F.3d at 1370. In principle, EZ Dock is right: the jury cannot be encouraged to depart from the Court's claim construction and to interpret the claims on their own. How Cobb, Herink, Beall, Pingel or others would have construed the claims (left to their own devices) is irrelevant to the issues now before the jury for trial. [FN4]

> FN4. To the extent the analyses and opinions of Defendants' experts reflect a claim construction other than the Court's January 22, 2003, claim construction, those opinions and analyses have no relevance to the issues for trial and will be excluded.

Furthermore, the parties are not entitled to "construe" the Court's claim construction. Nor can the parties argue that, based on the specification and the file history, the inventors "really" invented something other than what the trial court has construed the claims to mean. Defendants cite no authority for the proposition that the Court's claim construction is "open to interpretation" by the jury,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 1610781 (D.Minn.)
**(Cite as: 2003 WL 1610781 (D.Minn.))**

and the Court has found none. Accordingly, the Court will grant in part EZ Dock's motion and preclude Defendants from arguing to the jury how the claims of the patents-in-suit should be construed. Nothing in this ruling shall prevent Defendants from presenting evidence that is properly relevant to issues other than claim construction.

*D. EZ Dock's Motion to Preclude Defendants from Referring to Plaintiff Negatively Because It Sought Legal Protection for Its Invention or from Denigrating the Patent Office or Its Examiners*

EZ Dock seek pre-trial relief from the Court to prevent Defendants from "making comments or eliciting testimony that negatively refers to EZ Dock or inventor Neitzke or inventor Vierus as a 'monopolist' or EZ Dock owning a 'monopoly' or similar terms because they sought legal protection for their invention." With respect to both points, the Court can see no grounds on which the Defendants could introduce *testimony*--lay or expert--about either the competence of the PTO's examiners or the monopolistic character of a patent. As for *argument* on those points, in point of fact, a patent is a kind of monopoly that rewards the inventor (or patent holder) for having taken the initiative to "build a better mousetrap." To the extent Defendants would--in their closing argument--seek to describe EZ Dock as a "monopolist," EZ Dock is free to rebut that characterization. The old schoolyard chant about sticks and stones applies here as well.

*13 As for assertions that the PTO and its examiners are not diligent or are prone to error, the Court can find no relevance in either evidence to that effect or argument. It is Defendants' burden to prove, *by the greater weight of the evidence,* that the '055 patent (as re-examined) is either invalid or unenforceable. Aspersions are not evidence. Accordingly, the Court will grant in part EZ Dock's motion with respect to the PTO and its examiners.

*E. EZ Dock's Motion to Exclude References to Dismissed Claims*

During the course of this litigation, EZ Dock dismissed claims for trade dress infringement, deceptive trade practices, and unfair competition. EZ Dock now seeks a ruling precluding the Defendants from making any references to the dismissed claims. Defendants respond that the dismissal of the other claims is relevant to "rebutting EZ Dock's claim of willfulness and copying" and is relevant to Defendants' claim that EZ Dock has brought this suit

in bad faith, warranting fees to Defendants. Their legal analysis in opposition to the motion, however, focuses entirely on the Defendants' claim to attorneys fees and not at all to how dismissal of the claims relates to willfulness.

Under the patent statutes, "[t]he *court* in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S .C. § 285 (emphasis added). Thus, the question of whether this is an exceptional case is not one for the jury, but rather one for the Court. The Court finds that EZ Dock's dismissal of certain claims has no relevance to the patent infringement claim the jury must decide. Accordingly, the Court will grant the motion.

*F. EZ Dock's Motion to Preclude Defendants from Admitting Any Evidence or Testimony on Defendants Not Previously Pled, from Admitting Any Evidence or Testimony Regarding Prior Art Not Previously Identified, and from Admitting Any Evidence Or Testimony Regarding Untimely Supplemental Expert Reports*

After the time for filing motions in limine had passed, EZ Dock brought a last motion in limine, which has three distinct sub-parts. First, EZ Dock complains that Defendants are trying to proceed on an affirmative defense under § 132 that was not pled and, therefore, has been waived. [FN5] Second, EZ Dock argues that Defendants must be precluded from presenting a prior art reference--the Meriwether patent--that was disclosed for the first time in a § 282 disclosure on February 7, 2003. [FN6] Finally, EZ Dock contends that Defendants have untimely supplemented their expert reports, to EZ Dock's prejudice.

> FN5. Originally at issue in EZ Dock's motion were two affirmative defenses: the equitable defense of estoppel and the statutory defense of new matter. At the hearing on the motions in limine, Defendants advised the Court and opposing counsel that it was dropping the estoppel issue.

> FN6. Defendants had asserted thirty-eight new prior art references in the § 282 disclosure, to which EZ Dock had objected as being late. At the hearing on the motions in limine, Defendants advised the Court and opposing counsel that it was withdrawing the thirty-five prior art references it had marked as exhibits 49 through 86. As for the

Not Reported in F.Supp.2d                                                    Page 10
2003 WL 1610781 (D.Minn.)
**(Cite as: 2003 WL 1610781 (D.Minn.))**

'271 Brill patent, Defendants contend that they would not argue it to be invalidating prior art, but rather would simply like to present it to the jury to show the state of the art regarding floating docks. Defendants have failed to establish the relevance of the '271 Brill patent; accordingly, the Court will excluded it under Fed.R.Evid. 401 and 402.

Section 132 provides that "[n]o amendment shall introduce new matter into the disclosure of a the invention." Therefore, the affirmative defense that a patent is invalid based upon the introduction of new matter is a statutory affirmative defense. Review of the Amended Answer in this action, filed May 24, 2002, reveals that the Defendants did not plead a new matter affirmative defense or otherwise reference 35 U.S.C. § 132. The Court rejects the Defendants' efforts to bootstrap a new matter defense onto its affirmative defenses asserted under § 112. The Defendants failed to preserve a new matter affirmative defense in their responsive pleading under Fed.R.Civ.P. 12, and they are therefore precluded from presenting it at trial.

*14 As for the Meriwether patent, Defendants argue that there is no prejudice to EZ Dock because Meriwether was part of the file history of the EZ Dock patent on re-examination. This argument fails to address the fact that EZ Dock had served the Defendants with an interrogatory directing them to "identify all prior art of any kind, including but not limited to publications, disclosures, teachings, existing devices or prior art patents relating in any way to the subject matter claimed in the patent in suit" and to "state each and every fact that you allege supports the affirmative defenses" raised against EZ Dock's causes of action. (Mitchell Aff. Ex. C.) Although Defendants supplemented their responses to these interrogatories at various times through the course of discovery, they never disclosed the Meriwether patent. [FN7] The Court concludes that Defendants have prejudiced EZ Dock in their failure to supplement discovery responses with respect to the Meriwether patent. The Court will grant EZ Dock's motion with respect to the patent.

> FN7. At the motion in limine hearing, Defendants' counsel argued that the Meriwether patent did not become relevant until after the Court's January 22, 2003 claim construction order, an order that, among other things, rejected the Defendants' argument that the pylons have to have a circular base. Defendants have never

asserted until yesterday, however, that the Court's claim construction order would necessitate additional time for expert discovery or the supplementation of earlier discovery responses. In fact, the Court held a telephone conference with all counsel in early January, advising them of the Court's proposed timeline for issuing its *Markman* order by the end of January and discussing the feasibility of a March 10 trial date. During that telephone conference, neither party suggested that, because of the closeness in time between the *Markman* ruling and the proposed trial date, the trial should be continued to a later date.

Finally, the Court has already addressed the issue of supplemental expert reports, observing that Rule 26(e)(1) allows the parties to supplement expert reports up to the day pre-trial submissions under Rule 26(a)(3) are due. In this case, the Court ordered the parties to file their pre-trial submissions on February 20. EZ Dock has not indicated that any supplemental expert report was served on them after that date. Accordingly, the Court will permit the Defendants to examine their experts on matters disclosed in the final supplemental expert reports, subject to the Court's rulings above on the subject matter of expert testimony.

Conclusion

Based on the foregoing, and all of the files, records and proceedings herein, IT IS ORDERED that

1. EZ Dock's Motion in Limine to Exclude Evidence and Testimony Regarding Schafer Systems' Motion for Summary Judgment re: the alleged 35 U.S.C. § 102(b) on sale bar (Doc. No. 127) is GRANTED;

2. EZ Dock's Motion in Limine to Preclude Evidence or Testimony of Defendants' Own Patents (Doc. No. 129) is GRANTED;

3. EZ Dock's Motion in Limine to Exclude All Evidence and Testimony Inconsistent with the Court's Claim Construction (Doc. No. 131) is GRANTED IN PART in that Defendants shall not present evidence or testimony to the jury regarding how the claims of the patent-in-suit should be construed. Nothing in this ruling shall prevent Defendants, however, from presenting evidence that is relevant to issues other than claim construction.

4. EZ Dock's Motion in Limine to Exclude Evidence and Testimony of Glenn L. Beall (Doc. No. 133) is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 1610781 (D.Minn.)
**(Cite as: 2003 WL 1610781 (D.Minn.))**

Page 11

DENIED;

5. EZ Dock's Motion in Limine to Exclude Opinion Testimony of Kent A. Herink Addressing the State of the Law or His Legal Conclusions (Doc. No. 136) is GRANTED;

6. EZ Dock's Motion in Limine to Exclude Evidence and Testimony of Kent A. Herink Not Previously Disclosed in his Expert Witness Report (Doc. No. 138) is DENIED;

**\*15** 7. EZ Dock's Motion in Limine to Prevent Defense from Referring to Plaintiff Negatively Because It Sought Legal Protection for Its Invention or from Denigrating the Patent Office or Its Examiners (Doc. No. 141) is GRANTED IN PART with respect to testimony disparaging the PTO and its examiners;

8. EZ Dock's Motion in Limine to Exclude Opinion Letters of Mr. G. Brian Pingel and Evidence and Testimony Regarding Same (Doc. No. 143) is GRANTED IN PART. Defendants shall not introduce into evidence or elicit testimony from any witness about Pingel's letters dated December 2, 1999, April 3, 2001, April 29, 2002, and July 9, 2002.

9. EZ Dock's Motion in Limine to Exclude References to Dismissed Claims (Doc. No. 146) is GRANTED.

10. Defendants' Motion in Limine to Preclude Expert Report and Testimony of Arthur H. Cobb (Doc. No. 149) is GRANTED IN PART. Cobb shall not offer testimony regarding damages calculated under a "lost profits" analysis. Cobb may testify regarding damages calculated under a "reasonable royalty" analysis.

11. EZ Dock's Motion in Limine to Preclude Defendants form Admitting Any Evidence or Testimony on Defenses Not Previously Pled, from Admitting Any Evidence Or Testimony Regarding Prior Art Not Previously Identified, and from Admitting Any Evidence or Testimony Regarding Untimely Supplemental Expert Opinions (Doc. No. 165) is GRANTED IN PART. Defendants shall not present evidence or argument regarding the new matter defense under 35 U.S.C. § 132, and shall not present evidence regarding either the Meriwether patent or the ' 271 Brill patent.

2003 WL 1610781 (D.Minn.)

**Motions, Pleadings and Filings (Back to top)**

• 1998 WL 34320704 (Trial Pleading) Answer (Nov. 20, 1998)

• 1998 WL 34320704 (Trial Pleading) Answer (Nov. 20, 1998)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
1999 WL 203822 (N.D.Ill.)
(Cite as: 1999 WL 203822 (N.D.Ill.))

Page 1

H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern
Division.
THE THERMOS COMPANY and NIPPON SANSO
CORPORATION, Plaintiffs,
v.
STARBUCKS CORPORATION and PACIFIC
MARKET, INC., Defendant.
No. 96 C 3833.

April 6, 1999.

MEMORANDUM OPINION AND ORDER

KOCORAS, District J.

*1 This matter comes before the court on the
plaintiffs' motion to exclude the defendants from
raising a "previously undisclosed" non-infringement
defense, pursuant to Federal Rule of Civil Procedure
37. The plaintiffs argue that the defendants' failure to
raise the non-infringement defense in a timely
fashion serves to bar them from asserting the defense
at trial. For the reasons set forth below, we grant the
plaintiffs' motion.

DISCUSSION

Before the court in this patent case is a motion filed
by plaintiffs The Thermos Company ("Thermos") and
Nippon Sanso Corporation ("Nippon") (collectively
"the Plaintiffs"), in which they seek an order barring
the defendants Starbucks Corporation ("Starbucks")
and Pacific Market, Inc. ("Pacific Market")
(collectively "the Defendants") from asserting a
specific non-infringement defense. Essentially, the
Plaintiffs argue that the Defendants waited until
discovery was near-closed (although closed several
times in the past) in this now almost three year-old
case before disclosing and asserting a non-
infringement defense pertaining to temperature
ranges utilized in the patent-in-suit. We set forth the
background facts more fully below.

On October 13, 1992, the United States Patent and
Trademark Office ("the U.S. Patent Office") issued
United States Patent No. 5,153,977 ("the '977

Patent"), entitled "Method for Making Double-
Walled Insulating Metal Container." The Abstract for
the '977 Patent reads as follows:
  This invention relates to a method of making a
  double-walled thermally insulating metal container
  comprising an inner casing and an outer casing
  having an evacuation opening. A quantity of
  joining material is placed near or on the evacuation
  opening so as to cover the opening partially or
  completely. The assembly is treated in a vacuum
  furnace to evacuate the insulating space, to melt the
  joining material and to solidify the joining material
  in situ to provide vacuum sealing without resorting
  to a conventional sealing plate.
The '977 Patent does not identify or specify either
(1) the type or makeup of the utilized joining material
or (2) the appropriate temperature necessary to melt
the joining material.

Nippon is the assignee and owner of the entire right,
title and interest in the '977 Patent. Nippon
manufactures vacuum-insulated beverage containers
through the manufacturing process described and
claimed in the '977 Patent. Thermos is the exclusive
distributor of Nippon's products in the United States.
On September 10, 1996, Nippon and Thermos filed a
second amended complaint claiming Starbucks and
Pacific Market willfully infringed the '977 Patent.
The alleged infringement arises out of the so-called
"plug method" utilized by Pacific Market's supplier to
manufacture travel tumblers and other vacuumware
products. Pacific Market distributes the allegedly
infringing products to Starbucks, who, in turn, sells
them.

The parties settled seven of the Plaintiffs' original
eight claims against the Defendants. The only
remaining claim, Count II, alleges infringement of
the '977 Patent. [FN1] During the initial prosecution
of this matter, the Defendants asserted that they used
only two methods, "the First Method" and "the Plug
Method," to make allegedly infringing products
before adopting non-infringing methods.

  FN1. The parties also originally settled
  Count II, but this settlement fell through.
  See The Thermos Co., et al. v. Starbucks
  Corp., et al., 1998 WL 299469, 48
  U.S.P.Q.2d 1310 (N.D.Ill.1998) (this court's
  opinion on Plaintiffs' motion to enforce the
  terms of a settlement with respect to Count
  II).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
1999 WL 203822 (N.D.Ill.)
(Cite as: 1999 WL 203822 (N.D.Ill.))

Page 2

*2 In approximately September 1998, after the dust cleared on their settlement and near-settlement, the parties resumed paper discovery, beginning with their contentions regarding infringement of the '977 Patent's methods. In their Third and Fourth Sets of Interrogatories sent to the Defendants, the Plaintiffs sought information regarding which elements of the '977 Patent claims were admittedly used in, and which were allegedly not used in, any allegedly infringing methods. For their initial responses to the Plaintiffs' Third and Fourth Sets of Interrogatories, the Defendants provided Plaintiffs with "claim charts" identifying those claim limitations they conceded and those they disputed with respect to any allegedly infringing methods. The Defendants' claim charts were limited solely to the First Method and the Plug Method; the Defendants did not disclose any other methods used to manufacture stainless steel vacuum containers.

Step (f) of the asserted '977 Patent claims requires "raising a temperature of the joining material so as to liquify the joining material." Within the claim charts the Defendants originally submitted in response to the Plaintiffs' interrogatories, with respect to the First Method and the Plug Method, the Defendants stated that Step (f) was utilized in both methods and further stated that "*the material [in each method] is liquefied at the appropriate raised temperature.*" (emphasis added).

Approximately one month after submitting their original responses to Plaintiffs' Third and Fourth Sets of Interrogatories, within which they represented using only the two above-mentioned methods, and two business days before the first deposition was to proceed, the Defendants switched course and revealed that they in fact had used more than two prior methods. In a letter sent to Plaintiffs' counsel, defense counsel notified Plaintiffs that after "further discovery of the facts," "the specific [prior methods] have been clarified and we are in the process of gathering this information for production." In that same letter, the Defendants identified James H. Yu ("Yu") as "a person who has knowledge of" the prior methods used. This was apparently the Defendants' first identification or mention of Yu.

Faced with deposition schedules, discovery deadlines, Defendants' newly announced position on prior methods and newly identified witnesses, the Plaintiffs filed a Motion to Extend Discovery of Newly Disclosed Evidence and Witnesses, seeking, *inter alia,* final answers to their outstanding interrogatories, specifically with respect to identification of the prior methods used to make the allegedly infringing products. On November 5, 1998, we granted the Plaintiffs' motion. On November 13, 1998, the Defendants served new interrogatory answers on Plaintiffs, identifying four total prior methods used to manufacture stainless steel vacuum containers: "Method One"; "Method Two;" "Method Three;" and "the Plug Method." Defendants again supplemented their interrogatory answers with claim charts, and, as with their previous discovery responses, stated that Step (f) was utilized in all four prior methods and further stated that "*the material [in each method] is liquefied at the appropriate raised temperature.*" (emphasis added).

*3 On Tuesday, February 16, 1999, after we extended and closed discovery at least three times, the Defendants served their expert reports on the Plaintiffs, including reports from Michael J. Folise ("Folise") and W. Daniel Kay ("Kay"). In their reports, both Folise and Kay asserted several non-infringement defenses, including that three of the four prior methods did not infringe on the temperature raising limitation in step (f) of the '977 Patent because step (f)'s phrase "raising a temperature of the joining material so as to liquify the joining material" means raising the temperature to at least 1000° C.

The Plaintiffs now move to bar the Defendants from asserting the non-infringement defense that step (f) of the '977 Patent is limited to temperature ranges of at least 1000° C. The Plaintiffs argue that the Defendants' position is "flatly contrary" to the position repeatedly taken in their claim charts, namely, that the material used in the four prior methods was "liquefied at the appropriate raised temperature." The Plaintiffs also argue that the Defendants failed to supplement their discovery responses, as required by Federal Rule of Civil Procedure 26(e)(2), when they became aware of their changed position on the temperature issue. Finally, the Plaintiffs argue that allowing the Defendants to assert this "new" non-infringement defense, particularly at such a late stage in the litigation, would cause "inevitable" and extreme prejudice and would require significant additional discovery.

The Defendants present several responses to the Plaintiffs' motion. We address each below. For the reasons that follow, we grant the Plaintiffs' motion to exclude the Defendants' non-infringement defense relating to the '977 Patent's temperature ranges.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
1999 WL 203822 (N.D.Ill.)
(Cite as: 1999 WL 203822 (N.D.Ill.))

Page 3

## DISCUSSION

One word before we address the merits of the Plaintiffs' motion. Because of the highly-contentious nature of these proceedings, and our refusal to allow the parties to paper this court to death through the briefing of one motion after another, we set strict page limitations for the present briefs. Apparently the parties, the Defendants in particular, interpreted our page limitation order as an invitation to relegate half of their briefs contents to footnote status, where they could utilize the benefits of single spacing. Such was not the purpose of our order. We find the inclusion of eleven footnotes in a ten-page brief to be an anemic attempt to bypass our page limitation order and we will not tolerate such footnote briefing in the future.

### A. Applicable Law

We turn now to the merits of the Plaintiffs' motion. Because district courts are in the best position to determine if a party complies with its discovery obligations, we are given ample discretion to select an appropriate sanction when a party violates these obligations. *Melendez v. Illinois Bell Telephone Co., 79 F .3d 661, 670-71 (7th Cir.1996)* (citing *Patterson. Coca-Cola Bottling Co., 852 F.2d 280, 283 (7th Cir.1988)).* Our factual findings are reviewed under the "deferential clearly erroneous" standard and our selection of a discovery sanction will not be disturbed "absent a clear abuse of discovery." *Melendez, 79 F.3d at 671* (citing *Patterson, 852 F.2d at 283; Govas v. Chalmers, 965 F.2d 298, 301 (7th Cir.1992)).* These principles apply in patent cases where the court determines that a defendant asserted a defense in an untimely fashion and that such assertion prejudiced the plaintiff. *See Heidelberg Harris, Inc. v. Mitsubishi Heavy Industries, Ltd, 1996 WL 680243 (N.D.Ill.1996)* (court barred "best mode" defense where defendant raised the defense for the first time in their expert reports after the close of fact discovery); *see also Clintec Nutrition Co. v. Baxa Corp., 1998 WL 560284 (N.D.Ill.1998)* (in patent case, defendant "had an ongoing obligation to supplement its interrogatory answers since [plaintiff] specifically asked for [defendant's] claim interpretation;" therefore, defendant "may only offer those theories of claim interpretation it provided in its interrogatory answers.").

**\*4** The Defendants argue we should deny the Plaintiffs' motion to exclude for the following reasons: (1) they timely served the challenged non-infringement defense on the Plaintiffs; (2) the challenged non-infringement defense is properly

based upon the '977 Patent specifications and prosecution history; (3) the court has "a legal duty" to construe the scope of the asserted patent claims before the infringement issue is determined; (4) Plaintiffs' expert was aware of and recognized the Defendants' challenged non-infringement defense; and (5) full discovery on the temperature issue has been taken. We address each of these arguments below.

### B. Whether the Defendants Timely Served Plaintiffs With Notice of Their Non-Infringement Defense

The Defendants argue that they notified the Plaintiffs in a timely fashion of their intention to assert a non-infringement defense based upon (1) the type of joining materials used in their prior methods and (2) the temperatures utilized to liquify the joining materials in their prior methods. Essentially, the Defendants claim that their prior methods utilized joining material different than the joining material used in the '977 Patent and that the liquefying temperatures for their joining materials differ from the liquefying temperatures underlying the '977 Patent. Kay, one of the Defendants' experts, opined in his report that the '977 Patent contemplated the use of only brazing filler metals, such as nickel, as the joining material within the invention and, for this reason, the corresponding liquefying temperatures must be hot enough to effect the brazing filler metals in a manner consistent with the '977 Patent. Folise, Defendants' other expert, opined in his report that the term "joining material" within claim 1 of the '977 Patent "exclude[s] a room temperature solid meltable material having a melting point below 600°>> C." The Defendants argue that the inclusion in their claim charts of the statement "the material [in each method] is liquefied at the appropriate raised temperature" related only to the joining materials used in their prior methods, materials different than that utilized in the '977 Patent and materials that melted at temperatures different than those temperatures underlying the '977 Patent. We reject these arguments.

Withholding comment on the propriety of Kay's and Folise's interpretations of the '977 Patent, we think allowing the Defendants' to disclose the challenged opinions, and the underlying non-infringement defense, at such a late date would frustrate the purpose of our discovery rules and would greatly prejudice the Plaintiffs. Federal Rule of Civil Procedure 26(e)(2) states:
    a party is under a duty seasonably to amend a prior response to an interrogatory ... if the party learns

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that the response is in some material respect incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.

*5 Fed.R.Civ.P. 26(e)(2). The purpose of this requirement " 'is to prevent trial by ambush." ' *Heidelberg Harris, 1996 WL 680243 at *8* (quoting *Gorman v. Chicago Housing Authority, 1991 WL 10893 at *2 (N.D.Ill.1991)*).

In the present matter, we reject the Defendants' argument that they notified the Plaintiffs of the challenged non-infringement defense in November 1998, when they propounded claim charts for their four prior methods. The Plaintiffs twice served Third and Fourth Sets of Interrogatories on the Defendants. In response to these discovery requests, the Defendants repeatedly and consistently informed the Plaintiffs that "*the material [in each of their prior methods] is liquefied at the appropriate raised temperature.*" (emphasis added). We cannot envision a more clear and concise concession. The Plaintiffs rightly relied upon this concession in concluding that the Defendants did not intend to raise a non-infringement defense based upon the '977 Patent's temperature ranges.

The Defendants argue that their claim charts clearly demonstrated their intention of raising a non-infringement defense based upon the '977 Patent's temperatures. Specifically, the Defendants assert that because in response to step (d) of claim 1 of the '977 Patent (addressing the placement of the joining material near an evacuation opening), the Defendants responded "a joining material as disclosed and/or claimed is not used," the Plaintiffs were notified of the Defendants' reliance upon their use of different joining materials and, therefore, different applicable temperatures. We reject this argument. Regardless of their response to step (d), the Defendants clearly conceded any challenge to the '977 Patent's temperatures. We do not think the Plaintiffs should be required to hunt through the Defendants' claim charts, consider whether the appropriate joining materials are at issue, and *then* determine whether the Defendants assert a non-infringement defense based upon the applicable temperatures. In response to step (f), the Defendants could have simply notified the Plaintiffs of their position that different temperatures were present in the four prior methods. The Defendants failed to do so and now argue that the Plaintiffs should have interpreted their claim charts in such a fashion. We will not endorse such "hide the ball" discovery practices.

The evidence also makes clear that the Plaintiffs relied upon the Defendants' discovery concessions. After receiving the Defendants' interrogatory responses, the Plaintiffs embarked on a pattern and plan of discovery in which they did not anticipate any claim of non-infringement based upon the '977 Patent's temperature element. Thomas Butler, one of the Plaintiffs' experts, relied upon the Defendants' discovery concessions and concluded in his initial expert report that step (f)'s temperature element "is not in dispute and is clearly met by the [Defendants' four claimed methods] ." Also, it appears that in the 15 depositions taken in this case, the Plaintiffs did not ask a single question with respect to whether the four prior methods infringed the '977 Patent with respect to step (f). We think the record before us demonstrates that the Plaintiffs relied upon the Defendants' representations that they would not assert a non-infringement defense based upon the '977 Patent's temperature element and, based upon this reliance, failed to conduct any discovery on this issue. We think the Defendants' clearly violated their duty to supplement their previous interrogatory answers and intended to "ambush" the Plaintiffs' with the challenged non-infringement defense. For the reasons set forth above, and pursuant to the broad powers vested in this court pursuant to Federal Rule of Civil Procedure 37(d), we grant the Plaintiffs' motion to exclude the Defendants from asserting a non-infringement defense based upon the '977 Patent's temperature element.

*6 We find the present case very similar to *Heidelberg Harris.* In that patent case, the defendants raised a "best mode" defense for the first time in their expert reports, after the close of fact discovery. The plaintiff had previously served interrogatories asking the defendants to specify any challenges to the validity of the relevant patents. After discussing the Defendants' continuing obligations to supplement their discovery answers pursuant to Rule 26(e)(2), the court held "If a party is allowed to withhold the supplementation until after discovery is closed, the purpose of [Rule 26] is effectively frustrated because the opposing party is denied the opportunity to conduct discovery on the supplemented responses." *Heidelberg Harris, 1996 WL 680243 at *8.* The plaintiff claimed it was "completely unaware" of defendants' intention to raise the "best mode" defense until served with the expert reports. *Id.* The court found that the defendants "failed to appraise" plaintiff of their defense, resulting in "surprise" to the plaintiff. *Id.* The court also found that the plaintiff was prejudiced by the defendants' failure to

supplement because "had plaintiff been aware of defendants' intention to raise this defense, it would have altered the way it conducted discovery." *Id.* at *9. Finally, the court noted that "the plaintiff did not question a single witness on" the asserted "best mode" defense. For all these reasons, the *Heidelberg Harris* court barred the defendants from introducing any evidence of the asserted "best mode" defense. *Id.* at 10.

We find the *Heidelberg Harris* case persuasive. In the present matter, the Defendants raised a non-infringement defense for the first time in their expert reports, without supplementing their previous interrogatory answers. This disclosure came after the parties took approximately 15 depositions during which the Plaintiffs failed to ask a single question with respect to the ' 977 Patent's temperature element. The Plaintiffs claim they relied upon the Defendants' concessions when they formulated their discovery strategy. Finally, demonstrating conduct we think even more egregious than the *Heidelberg Harris* defendants, the present Defendants first conceded the temperature issue, allowed discovery to proceed, and then only *later* changed their tune and raised the challenged non-infringement defense. We will not condone such conduct.

For all the reasons set forth above, we grant the Plaintiffs' motion to exclude.

C. Defendants' Additional Responses to the Present Motion

We briefly address the Defendants' other responses to the Plaintiffs' motion. The Defendants first assert that the challenged non-infringement defense is properly based upon the '977 Patent's specifications and prosecution history. They also argue that we have a "legal duty" to construe the scope of the asserted patent claims before we determine whether their prior methods infringed on the '977 Patent. While both of these assertions may be true or not true (we do not today comment on either of these arguments), neither response addresses the true issue: whether the Defendants violated their discovery obligations. Simply because we may ultimately construe the scope of the '977 Patent does not eviscerate the Defendants' obligations to keep the Plaintiffs' appraised, in a timely fashion, of their non-infringement defenses. The same rationale applies to the question of whether the challenged non-infringement defense is or is not meritorious. Simply, the Defendants arguments are *non sequitur* for purposes of the present motion.

*7 The Defendants next argue that the Plaintiffs' experts were aware of and recognized the Defendants' non-infringement defense based upon the temperature element. The record, however, does not support the Defendants' assertion. As noted above, Thomas Butler, one of the Plaintiffs' experts, opined that the temperature element "is not in dispute and is clearly met by the accused process." The Plaintiffs' other expert, Mark Newman, simply recognized that Folise, one of the Defendants' experts, testified in his deposition that he would need to know the temperature utilized in the '977 Patent's process and was without such information. We do not think this simple recognition by Newman constitutes "addressing the issue," as Defendants assert.

Finally, the Defendants argue that the parties have taken "full discovery" on the temperature issue. In support of this assertion, the Defendants point to the deposition testimony of James H. Yu, the witness they first disclosed in November 1998. As with their previous assertion, we do not think the record supports the Defendants' claim. At Yu's deposition, both Plaintiffs' and Defendants' counsel questioned Yu about the Defendants' four prior methods. In addition to describing other elements of the prior methods, Yu referred to the use of lower temperatures in these methods. Based upon these questions and Yu's answers, the Defendants make their "full discovery" assertion. The Defendants ignore, however, that on the date of Yu's deposition, November 20, 1998, they had already conceded the temperature issue in their interrogatory responses. Based upon this concession, Plaintiffs' counsel had no reason to question Yu about the temperature issue and, as the *Heidelberg Harris* court noted, it is the Plaintiffs' ability to engage in discovery on an asserted defense that is of utmost importance. *Heidelberg Harris,* 1996 WL 680243 at * 9-10.

CONCLUSION
For the reasons set forth above, we grant the Plaintiffs' motion to exclude the Defendants from asserting a non-infringement defense relating to the temperatures utilized in the '977 Patent.

1999 WL 203822 (N.D.Ill.)

**Motions, Pleadings and Filings (Back to top)**

-       1:96CV03833        (Docket) (Jun. 24, 1996)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                     Page 1
1996 WL 680243 (N.D.Ill.), 42 U.S.P.Q.2d 1369
**(Cite as: 1996 WL 680243 (N.D.Ill.))**

**H**

**Motions, Pleadings and Filings**

United States District Court, N.D. Illinois, Eastern
Division.
HEIDELBERG HARRIS, INC., Plaintiff,
v.
MITSUBISHI HEAVY INDUSTRIES, LTD. and
MLP U.S.A., Inc., Defendants.
No. 95 C 0673.

Nov. 21, 1996.
Alan N. Salpeter, Javier H. Rubinstein, Mayer,
Brown & Platt, Chicago, IL, Richard L. Mayer,
Richard L. DeLucia, Richard S. Gresalfi, Michael D.
Loughnane, Kenyon & Kenyon, New York City, for
Plaintiff.

Harry J. Roper, William P. Oberhardt, John E. Titus,
George S. Bosy, Roper & Quigg, Chicago, IL, for
Defendants.

*MEMORANDUM OPINION AND ORDER*

ASHMAN, United States Magistrate Judge.

**\*1** This case was brought by Heidelberg Harris, Inc.
("Harris"), charging Defendants, Mitsubishi Heavy
Industries, Ltd. and Mitsubishi Lithographic Presses,
U.S.A., Inc. ("Mitsubishi"), with the infringement of
three patents owned by Harris, all of which involve
offset printing presses that are used in the printing of
newspapers, magazines and other publications.
Mitsubishi denies the infringement of any Harris
owned patents and further claims that the patents are
invalid and unenforceable. In their answers,
Defendants presented several affirmative defenses,
including the defense that Patent Nos. '267, '048 and
'981 are unenforceable and invalid because the
alleged inventions failed to meet one or more of the
conditions of patentability set out in Title 35 U.S.C. §
§ 102, 103 and 112.

After the close of fact discovery on May 17, 1996,
the parties exchanged expert reports. As a result of
information contained in these reports, Plaintiff
claims it became aware for the first time of
Defendants' intention to raise the defense of
inequitable conduct in connection with the
prosecution of the '048 and '981 Patents, in addition

to Defendants' intention to raise a Section 112 "best
mode" defense. Consequently, Plaintiff filed these
two motions *in limine* to prevent Defendant from
introducing any evidence with respect to these
defenses at trial. In response to Plaintiff's inequitable
conduct motion *in limine,* Defendants filed a motion
to amend their answer.

The Court will first address Plaintiff's inequitable
conduct motion *in limine* in conjunction with the
Defendants' motion to amend their answer and will
then turn to the Plaintiff's second motion *in limine*
concerning the Section 112 "best mode" defense.
I. Plaintiff's Motion *In Limine* To Preclude The
Introduction of Evidence Related To the
Inequitable Conduct Defense and Defendants'
Motion To Amend Their Answer To the
Complaint.

Plaintiff advances three arguments in favor of its
first motion *in limine:* (A) Defendants failed to raise
the affirmative defense of inequitable conduct in their
answers and additionally failed to plead that defense
with the particularity required by FED. R. CIV. P.
9(b); (B) Defendants should be barred from
amending their answer to include this affirmative
defense because such an amendment would be unfair
and prejudicial; and (C) such an amendment should
be barred because Mitsubishi's allegations are futile.
The Court will address each argument in turn.

A. Defendants' Failure To Plead The Inequitable
Conduct Defense

Plaintiff first argues that Defendants did not plead
inequitable conduct as an affirmative defense in any
of their answers and further never indicated through
interrogatory answers that they had any intention of
raising this defense. Plaintiff not only argues that this
defense should have been pled, but further contends
that it should have been pled with sufficient
particularity to satisfy the requirements of FED. R.
CIV. P. 9(b) ("Rule 9(b)"), which Plaintiff argues
applies to claims of inequitable conduct.

**\*2** Defendants contend that their answer sufficiently
pleads the affirmative defense of inequitable conduct.
However, no citation to a paragraph in the answer is
given to support this proposition. Additionally,
Defendants allege that claims of inequitable conduct
need not be pled with the particularity required by
Rule 9(b). Despite the above argument, Mitsubishi

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 2
1996 WL 680243 (N.D.Ill.), 42 U.S.P.Q.2d 1369
**(Cite as: 1996 WL 680243 (N.D.Ill.))**

moves to amend its answer to conform to the requirements set out by Rule 9(b) regarding specificity in pleading claims involving fraud.

FED. R. CIV. P. 9(b) requires: "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." FED. R. CIV. P. 9(b). One of the rule's purposes in requiring particularity in the pleadings is "to deter the filing of charges of fraud as a pretext for discovery of unknown wrongs." *Solarex Corp v. Arco Solar, Inc.,* 121 F.R.D. 163, 178 (E.D. N.Y. 1988). Although the Federal Circuit has not directly addressed the need to plead inequitable conduct claims with specificity, the general trend, including that in this district, requires that inequitable conduct be pled in accordance with the specificity requirements of Rule 9(b). *Northern Eng'g & Plastics Corp. v. Blackhawk Molding Co.,* 205 U.S.P.Q. 609, 610 (N.D. Ill. 1979); *Solarex Corp. v. Arco Solar, Inc.,* 121 F.R.D. 163, 178 (E.D. N.Y. 1988), *aff'd,* 870 F.2d 642 (Fed. Cir. 1989); *Sunflex Co. v. Softview Computer Prods.,* 18 U.S.P.Q.2d 1171, 1172 (N.D. Ill. 1990); *Energy Absorption Sys. v. Roadway Safety Servs. Inc.,* 28 U.S.P.Q.2d 1717, 1718-19 (N.D. Ill. 1993). This Court agrees that claims of fraud, including claims of inequitable conduct, should be supported by specific allegations as mandated by Rule 9(b). Such a requirement prevents claims of fraud from being used to impugn the integrity of attorneys involved in patent prosecutions without sufficient evidence that wrongdoing has in fact occurred and constrains the utilization of such claims to redressing wrongs committed, rather than to uncovering wrongs merely suspected.

Defendants have failed to plead their inequitable conduct defense with sufficient particularity to satisfy the dictates of Rule 9(b). Nowhere in Defendants' answers does this Court find any allegations which demonstrate that the inequitable conduct defense was ever pled, much less pled with any specificity. Only in the broadest terms is it possible to infer that the allegations regarding the unenforceability of the '048 and '981 Patents under 35 U.S.C. § § 102 and 103 might encompassed facts which would support an inequitable conduct defense.

As a result of Defendants' failure to adequately plead the inequitable conduct defense, the Plaintiff's motion *in limine* will be granted unless the Court allows the Defendants to amend their answer. Consequently, the Court next turns to the arguments advanced by both sides on Defendants' motion to amend the answer.

**B. The Plaintiff Will Suffer Undue Prejudice If the Defendants' Motion To Amend Is Granted.**

*3 Defendants move for leave to amend their answer to add more specific allegations on their inequitable conduct defense in the event the Court determines that such specificity is required. Plaintiff, however, contends that Mitsubishi should be prevented from amending its answer after the close of fact discovery because such an amendment would be would be prejudicial.

Leave to amend may be denied where it would either prejudice the opposing party or result in the addition of a futile allegation. *Foman v. Davis,* 371 U.S. 178, 182 (1962). Plaintiff alleges that it would be prejudiced by the proposed amendment because it had no notice that inequitable conduct would be at issue until after fact discovery was closed. Therefore, Plaintiff argues that it has been deprived of the opportunity to explore the basis for the Defendants' claim. Plaintiff further alleges that to reopen discovery would prejudice Plaintiff by causing undue delay of the trial. However, the Court notes that a trial date has yet to be set in this case.

Defendants claim that Plaintiff will not suffer any prejudice as a result of the delay. Defendants claim that the only Mitsubishi witness Plaintiff will have to depose on this issue is Mitsubishi's expert and expert depositions have not yet begun. Defendants further contend that any other information related to this claim would be in Plaintiff's possession, [FN1] thereby eliminating any real need for further discovery by Plaintiff. Thus, Defendants claim that Plaintiff would suffer no prejudice as a result of allowing Defendants' amendments on this issue.

> FN1. Examples of information in Plaintiff's possession includes information known by Plaintiff's employees and documents produced by Plaintiff related to this defense.

While Plaintiff may suffer some prejudice as a result of allowing this amendment, the Plaintiff was unable to articulate any specific examples of how it would be prejudiced or what it would have done differently had it been made aware of this defense earlier. The Court finds that the Plaintiff's general allegations of prejudice regarding delay and additional expense do not rise to a level sufficient to override, on their own, the liberal right to amend embodied by FED. R. CIV. P. 15(a). Therefore, the Court is unwilling to deny the Defendants' motion for leave to amend based on this ground alone.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1996 WL 680243 (N.D.Ill.), 42 U.S.P.Q.2d 1369
(Cite as: 1996 WL 680243 (N.D.Ill.))

C. The Defendants' Proposed Amendment Is Futile.

Plaintiff's final contention is that the amendment should not be allowed because Defendants' inequitable conduct claim is futile. Plaintiffs argue that a proposed amendment is futile if it could not survive a motion for summary judgment. Citing *CBS., Inc. v. Ahern,* 108 F.R.D. 14, 18 (S.D. N.Y. 1985), Defendants, on the other hand, contend that the proper standard for deciding whether a motion to amend should be denied for futility is whether the amendment would survive a motion to strike under Fed. R. Civ. P. 12(f). To survive a motion to strike, Defendants argue they need only present facts which, if proven, would constitute a valid defense.

A proposed amendment is futile if it could not withstand a motion for summary judgment. *Porter v. State of Illinois,* 36 F.3d 684, 690 (7th Cir. 1994). Although some courts base their futility determination on whether the amendment would survive a motion to dismiss, the parties here have appended substantial evidence to their memoranda for the Court's consideration. When evidence is attached to a motion to dismiss under FED. R. CIV. P. 12(b)(6) and is not excluded from consideration, the motion is treated as one for summary judgment. FED. R. CIV. P. 12(b). Because the Court will be going beyond the scope of the complaint and proposed answer to reach its conclusion, the Court finds the standard used in analyzing motions for summary judgment appropriate here. Consequently, the Court must determine whether each allegation of inequitable conduct proposed in the amendment to the answer could survive a motion for summary judgment.

*\*4* To establish inequitable conduct, clear and convincing proof of each of the following is required: (1) that the applicant or one substantially involved with the prosecution of a patent omitted or misrepresented material prior art or information; (2) that such person knew of the materiality of the prior art; and (3) intended to deceive the Patent Office by deliberately withholding the prior art or information. *Kingsdown Medical Consultants, Ltd. v. Hollister, Inc.,* 863 F.2d 867,872 (Fed. Cir. 1988), *cert. denied,* 490 U.S. 1067 (1989).

Plaintiff asserts that there are two basic inequitable conduct allegations in Defendants' expert's report and that neither is sufficient to support a charge of inequitable conduct. The first claim of inequitable conduct centers around Defendants' claims that Mr.

Hobby made untrue statements in the affidavit he submitted to the Patent Examiner in connection with the '048 Patent prosecution. Defendant claims that Mr. Hobby made three material misrepresentations about the commercial success and performance of the '048 patented presses including: (1) that the presses cost approximately $12 million dollars each; (2) that the presses operated with good print quality at speeds up to 3000 feet per minute and (3) that the presses were regarded as a commercial success by the industry. Defendants claim that these allegations were made to overcome the Patent Examiner's prior rejection of Plaintiff's patent application on the grounds of obviousness under 35 U.S.C. § 103.

With respect to the first contention, Defendants claim that Mr Hobby grossly inflated the selling price of the presses by claiming that they sold for $12 million each when, in fact, only three of the presses sold for $12 million and over half generated net revenues of less than $10 million.

Plaintiff responds that Mr. Hobby's statement was not false. In his affidavit, Mr. Hobby stated that "while prices vary, each Sunday Press costs about $12 million dollars." Plaintiff argues that the average list price at the time Mr. Hobby gave his affidavit was $12,614,922 and the average net price was $11,459,208. Additionally, Plaintiff points out that rebates given to some customers after the date of Mr. Hobby's affidavit can hardly be used as evidence of dishonesty on Mr. Hobby's behalf.

Defendant never establishes how the difference in price it alleges is material. However, even assuming the materiality of this fact, there is insufficient evidence to support Defendants' contentions. Plaintiff's price chart establishes that, as of August 10, 1994, the average cost was about $12 million per machine. (Exhibit 37 of Plaintiff's Reply Brief). Mr. Hobby gave his affidavit on August 11, 1994. Defendants' price chart, on the other hand, covers fiscal years 1993 to 1996 and therefore covers periods extending far beyond the period relevant to a determination of the veracity of Mr. Hobby's affidavit statements. Additionally, the Defendants' own price chart establishes that the average gross sales price was around $11 million. Mr. Hobby's affidavit stated the average cost of a press, not the average revenue generated by the sale of a press. Consequently, Mr. Hobby's failure to figure in the effect of any rebates, allowances, and commissions does not constitute a misrepresentation on his behalf. The evidence presented supports Plaintiff's claim that Mr. Hobby's affidavit was factually correct at the time. Therefore,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1996 WL 680243 (N.D.Ill.), 42 U.S.P.Q.2d 1369
(Cite as: 1996 WL 680243 (N.D.Ill.))

not only is the materiality of the presses' cost questionable, but Defendants have also failed to establish that Mr. Hobby's statements regarding the cost of the presses were, in fact, misrepresentations.

*5 In addressing the second and third contentions, Defendants claim that Plaintiff misrepresented the performance capabilities and the commercial success of the press. Defendants contend that several of Plaintiff's customers were complaining about the performance of the presses in that they were not performing at the promised 3000 feet per minute rate with acceptable print quality. Defendants argue that these complaints refute Plaintiff's claim that the industry considered the presses to be a commercial success, since the people most familiar with the presses, namely the customers, were dissatisfied. Defendants contend that, not only does the dissatisfaction of these customers contradict Plaintiff's claim of commercial success, they also demonstrate that the presses did not produce good print quality at speeds of 3000 feet per minute, as stated by Mr. Hobby in his affidavit.

Based on the evidence presented, the Defendants' motion to amend the answer to include Paragraph 38(a) is denied. First, Mr. Hobby never stated that there were no problems or complaints with the presses in his affidavit. At the time the affidavit was given, the only complaints Plaintiff had received were from R. R. Donnelley regarding six of the early presses. The only other complaint was received after Mr. Hobby made his affidavit. [FN2] The Court does not find that the failure to reveal one customer's complaints makes Mr. Hobby's statements about the commercial success or the performance abilities of the presses misleading or deceptive, especially when viewed in light of evidence existing at the time, which supported Plaintiff's and Mr. Hobby's statements that the press operated with good print quality at speeds of up to 3000 feet per minute. (Exhibits 38 and 39 of Plaintiff's Reply Brief). Consequently, the Court does not find that the Defendants have presented sufficient evidence to raise a genuine issue of material fact as to Plaintiff's intent to mislead or as to Plaintiff's alleged submission of false information to the Patent Examiner and therefore, the Court denies the Defendants' motion to amend its answer to add Paragraph 38(a).

> FN2. Perry Printing's complaints regarding the performance of on of the Harris' presses was dated December 7, 1994 -- nearly four months after Mr. Hobby gave his affidavit to

the Patent Office.

The Defendants' second inequitable conduct allegation is based on the Defendants' contentions that Plaintiff and its attorneys never revealed the existence of the Vanguard Press or Ghormley '851 Patent to the patent examiner, even thought Mr. Hobby, Plaintiff's Vice President of Marketing, was aware of the existence of the press and of its acquisition by Plaintiff, many years before, when he gave his affidavit to the Patent Office during the prosecution of the '048 Patent. Defendants contend that this information was relevant as prior art, which Plaintiff had a duty to disclose.

Plaintiff argues that the evidence uncovered through discovery shows that no one knew of the features Defendants claim the press had, which would make it relevant as prior art, nor of the Ghormley '851 Patent, and thus, there was no intent to deceive or withholding of information from the Patent Office. [FN3]

> FN3. Additionally, the Plaintiff argues that there is no disagreement that the Vanguard press was different from the press patented under the '048 Patent in that the Vanguard press did not contain a removable gapless blanket, while the blanket on the '048 patented press was both removable and gapless. Plaintiff appears to be contending that the Vanguard press would not have been relevant as prior art, even if Mr. Hobby or the others had sufficient knowledge of the Vanguard press. (Footnote 4 of Plaintiff's Motion *In Limine*).

*6 In response, Defendants claim that this press was on display at a plant that was visited by many Harris employees, including Hobby, and that Mr. Hobby attempted to locate an old Vanguard press, thereby establishing Mr. Hobby's familiarity with the press. Plaintiff, however, argues that neither Mr. Hobby nor any of the inventors ever saw the press allegedly kept at the Texas plant as a museum piece, and that Mr. Hobby was only trying to obtain an old press, not necessarily a Vanguard press.

The Defendants' motion to amend the answer is denied as to the inclusion of proposed Paragraph 38(b)(i) and (ii). The evidence supports the Plaintiff's contention that Mr. Hobby did not know anything substantive about the Vanguard press and was not even aware of the fact that Harris had purchased the Vanguard technology. Conversely, there is no

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                          Page 5
1996 WL 680243 (N.D.Ill.), 42 U.S.P.Q.2d 1369
**(Cite as: 1996 WL 680243 (N.D.Ill.))**

evidence that any of the inventors of the press at issue (the '048 patented press) or Mr. Hobby every saw the Vanguard press and no evidence that any of the inventors even knew what the features of the press were. Two of the inventors and Mr. Hobby had heard the term "Vanguard press" before, but there is insufficient evidence to establish that any of the inventors or Mr. Hobby had enough knowledge about the press to know that it might be relevant as prior art. Consequently, there is no evidence to support the conclusion that these individuals withheld prior art with the intent to mislead the Patent Examiner.

The final inequitable conduct contention submitted by Defendants centers around Plaintiff's alleged failure to disclose the existence of the "Speedwell Sleeve System," a flexographic printing sleeve that Defendants claim is relevant as prior art. Plaintiff, however, contends that the patents on the "Speedwell Sleeves" were disclosed to the Patent Office. Plaintiff states that the patents covering this invention were listed as cited references on a document given to the Patent Office in connection with the prosecution of the '048 Patent.

Defendants' motion to amend the answer to include the allegations contained in Paragraph 39 is denied. Defendants have provided no proof, other than their unsupported allegations, that Plaintiff ever withheld this information from the Patent Office. Furthermore, Plaintiff has provided evidence that the patents which covered the Speedwell Sleeves were included as cited references in another document which was given to the Patent Office in connection with the prosecution of the '048 Patent (Exhibits 34, 40, 41, 42 of Plaintiff's Reply Brief). The evidence refutes Defendants' unsupported allegations of inequitable conduct with respect to the Plaintiff's alleged failure to notify the Patent Office of the Speedwell Sleeve System and the Defendants' motion to amend their answer to add Paragraph 39 is therefore denied.

This Court finds that, for the above reasons, none of Defendants' claims of inequitable conduct could survive a motion for summary judgement, thereby establishing the futility of the claims Defendants seek to add. The Defendants' motion to amend is therefore denied and Plaintiff's motion *in limine* as to the Defendants' inequitable conduct defense is granted.

II. Plaintiff's Motion *In Limine* to Preclude the Introduction of Evidence On the Defendants' "Best Mode" Defense

*7 The Plaintiff's second motion *in limine* is directed

at precluding the introduction of any evidence regarding a violation of 35 U.S.C. § 112, specifically regarding Defendant's contention that Plaintiff's inventors violated the "best mode" requirement of Section 112 by concealing as proprietary one of the key ingredients used to make the rubber in the print blanket. Plaintiff, on the other hand, contends that its motion *in limine* should be granted because Defendants failed to timely notify Plaintiff of the defense and failed to supplement their interrogatories with respect to this defense. Consequently, Plaintiff contends it will be prejudiced by the Defendants' introduction of any evidence of this issue at trial.

Plaintiff contends that, although Defendants made broad allegations in their answer that the patents at issue were invalid under 35 U.S.C. § 112, when asked about the nature of their Section 112 defense in subsequent interrogatory questions, Defendants failed to set forth any grounds upon which they were going to challenge the validity of the asserted claims under Section 112. Plaintiff contends that Defendants revealed the basis of their Section 112 defense for the first time in their expert reports, after fact discovery had closed, thereby failing to comply with their duty to supplement information contained in interrogatory responses under FED. R. CIV. P. 26(e)(2). Consequently, Plaintiff argues that Defendants should be precluded from presenting evidence on this issue at trial for failing to supplement the interrogatory answers.

Plaintiff finally contends that allowing Defendant to raise this defense now, after fact discovery has closed, would be prejudicial because Plaintiff will have been denied its opportunity to investigate the underlying facts and develop a response. Plaintiff alleges that, had it know of the details of Defendants' Section 112 defense, it would have modified its approach in deposing Sumitomo and Mitsubishi representatives. Plaintiff claims that it cannot redepose 50 witnesses or afford the expense of investigating this new defense.

While the Plaintiff was given general notice of Defendants' intent to assert a Section 112 defense, both through the Defendants' answer and its responses to interrogatories, [FN4] the details of and the basis for that defense were never fleshed out until after fact discovery closed and the Defendants' expert reports were disclosed. The Defendants imply that they were unable to provide the specifics of their Section 112 defense until after they deposed Harris' named inventors on the subject. These depositions took place one month before the Defendant provided

Not Reported in F.Supp.                                                                                     Page 6
1996 WL 680243 (N.D.Ill.), 42 U.S.P.Q.2d 1369
(Cite as: 1996 WL 680243 (N.D.Ill.))

the Plaintiff with the expert reports. However, after
reviewing the deposition testimony provided, there is
no indication that the depositions did anything to
enhance the Defendants' understanding of this
defense or provide the Defendants with any of the
facts they needed to flesh out this defense.

> FN4. The Defendants' answer included the
> following allegations:
> The claims of the [patents in suit] are invalid
> and/or unenforceable because the alleged
> inventions purported to be claimed therein
> fail to meet one or more of the conditions
> for patentability specified in Title 35, United
> States Code, specifically sections 102, 103,
> and 112.
> To the extent that plaintiff alleges that any
> asserted claim of the [ [ [patents in suit]
> allegedly is of a scope sufficient to cover
> any activity by defendants, each such claim
> is invalid and/or unenforceable because each
> such claim fails to meet one or more of the
> conditions for patentability specified in Title
> 35, United States Code, specifically sections
> 102, 103, and 112.
> Additionally, in response to Plaintiff's
> interrogatory and supplemental interrogatory
> questions regarding the basis and factual
> grounds for the Section 112 defense,
> Defendants stated:
> To the extent that plaintiff seeks to ignore
> limiting elements of the as yet unasserted
> claims of the patents at issue, and attempts
> to broadly construe the claims of patents at
> issue to cover the accused press, blanket,
> and/or method, Mitsubishi states that one or
> more of the following prior art references
> (copies of which have been or are being
> produced by plaintiff to Mitsubishi), alone
> or in combination, would render the claims
> of the patents invalid under 35 U.S.C. § §
> 102, 103 and/or unenforceable. Furthermore,
> any such broad interpretation of the claims
> would lack support in the patent
> specification under 35 U.S.C. § 112.

The Defendants base their "best mode" defense on
the phrase "proprietary curative in nitrile polymer"
which appears in the text of both the blanket method
and the August patents. Mitsubishi had notice that the
August patent was at issue on November 13, 1995,
when Plaintiff filed its Second Amended Complaint,
and that the blanket method patent was at issue on
February 2, 1995, when the Plaintiff filed this suit.
Additionally, other documents establishing that the

Harris inventors knew the exact formula for the best
printing rubber were disclosed to Defendant in June
and July of 1995. [FN5] Consequently, the Court
finds that Defendants' had notice of the facts that
form the basis of their Section 112 defense well
before the close of fact discovery on May 17, 1996.

> FN5. Documents DX-120, DX-136 and
> DX-55 (Exhibits 6 and 7 of Mitsubishi's
> Reply to Harris' § 112 Motion *In Limine*
> and Exhibit 5 of Harris' Response to
> Mitsubishi's' Reply) establish that Harris'
> inventors obtained the exact formula for the
> best printing rubber from American Roller
> Company. In its Response to Harris' Motion
> *In Limine,* Mitsubishi refers to these
> documents to support its assertion that
> Harris violated Section 112's best mode
> requirement because it obtained the formula
> for the printing rubber, but nevertheless,
> concealed the formula as proprietary.
> Consequently, it is clear that, at a minimum,
> Mitsubishi was aware of the substance of its
> Section 112 defense in July of 1995, when
> these documents were produced.

*8 Under FED. R. CIV. P. 26(e)(2)
> a party is under a duty seasonably to amend a prior
> response to an interrogatory ... if the party learns
> that the response is in some material respect
> incomplete or incorrect and if the additional or
> corrective information has not otherwise been
> made known to the other parties during the
> discovery process or in writing.

"The [ ] Court has broad discretion in determining
whether to impose sanctions, including the exclusion
of evidence, for discovery violations." *Boynton v.*
*Monarch,* 1994 WL 463905, *1, 1994 U.S. Dist.
LEXIS 11967, *1 (N.D. Ill. 1994) (citing *Scaggs v.*
*Consolidated Rail Corp.,* 6 F.3d 1290, 1295 (7th Cir.
1993)). Consequently, failure to supplement
interrogatory responses under Rule 26(e)(2) may, at
the Court's election, result in the exclusion of all
evidence related to the non-supplemented subject.
[FN6] *Holiday Inn, Inc. v. Robertshaw Controls Co.,*
560 F.2d 856, 858 (7th Cir. 1977).

> FN6. Defendants contend that the Plaintiff's
> motion *in limine* is nothing more than an
> attempted end run around Rule 37(b)(2)(B)
> which requires the party seeking a more
> complete discovery response to obtain a
> court order compelling further discovery, the
> violation of which may result in sanctions,
> including the exclusion of the relevant

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                              Page 7
1996 WL 680243 (N.D.Ill.), 42 U.S.P.Q.2d 1369
(Cite as: 1996 WL 680243 (N.D.Ill.))

evidence. While this may have been one option open to Plaintiff, had it been able to determine that the Defendants were still intending to assert the Section 112 defense, the Court, at its discretion, is empowered to order sanctions without resort to Rule 37. *See Holiday Inn v. Robertshaw Controls Co.*, 560 F.2d 856 (7th Cir. 1977); *Jefferson v. Davis*, 131 F.R.D. 522 (N.D. Ill. 1990); *Boynton v. Monarch*, 1994 WL 463905, 1994 U.S. Dist. LEXIS 11967 (N.D. Ill. 1994).

Defendants here do not contend that they were unable to produce the supplemental information at an earlier date, but rather, rely on the argument that, by providing the information in their expert reports, they have satisfied their duty to seasonable supplement their interrogatory responses under Rule 26(e)(2). [FN7] Defendants contend that their duty to supplement under Rule 26(e)(2) is satisfied because they informed Plaintiff of the details of their Section 112 defense via their experts' reports, thereby making the updated information known to the Plaintiff during the discovery process. Defendants apparently contend that, since expert discovery has not concluded, the discovery process is not yet over.

> FN7. Defendants contend that Rule 26(e) simply requires the supplementation to occur "at appropriate intervals." Mitsubishi contends that it provided the supplemental information only four months after answering the interrogatories, and since no trial date is pending, it has updated its interrogatory answers within an appropriate interval.

However, the Court finds that this type of supplementation was not what the drafters of Rule 26(e)(2) envisioned. "The purpose of [Rule 26(e)(2)] is to prevent trial by ambush." *Gorman v. Chicago Housing Authority*, 1991 WL 10893 *2 (N.D. Ill. 1991)*. If a party is allowed to withhold the supplementation of its discovery responses until after fact discovery is closed, the purpose of the Rule is effectively frustrated because the opposing party is denied the opportunity to conduct discovery on the supplemented responses.

As the Court has concluded that Defendants have failed to supplement their interrogatory responses as required by Rule 26(e)(2), the relevant inquiry now becomes whether the opposing party was "prejudicially surprised." *Gorman, 1991 WL 10893*

at *2 (citations omitted). Harris alleges that it was completely unaware of Mitsubishi's intention to assert this defense until after discovery was closed and the expert reports were exchanged. Conversely, Mitsubishi contends that Harris was fully aware of their intention to assert this defense as a result of Mitsubishi's answer and interrogatory responses. The Court finds that, while the Defendants' answer and nebulous interrogatory responses [FN8] may have served to put Harris on notice as to the possibility of a Section 112 defense being raised, [FN9] they failed to apprise Harris of the substance and basis for that defense. Consequently, the Court finds that Harris was surprised as to the factual basis and substance of Defendants' § 112 defense.

> FN8. *See* footnote 2 for the substance of Mitsubishi's answer and interrogatory responses on this issue.

> FN9. The Court uses the term "may have" here because the Defendants' interrogatory responses were vague as to the Defendants' intention to assert a Section 112 defense, thus lending credibility to the Plaintiff's claim that it was under the impression that Defendants were no longer planning to pursue this defense unless other patent claims were asserted by the Plaintiff.

*9 As to the prejudice element, Defendants' claim that Plaintiff will suffer no prejudice as a result of Mitsubishi's method of disclosing its Section 112 defense. Defendants contend that the only Mitsubishi witnesses Harris will have to depose are the two experts and expert depositions have not yet begun. Furthermore, Defendants claim Plaintiff is free to examine its own inventors on this subject at any time it chooses.

Contrary to Defendants' assertions, this Court finds that Plaintiffs were prejudiced by Mitsubishi's failure to timely supplement its interrogatory responses. Had Plaintiff been aware of Defendants' intention to raise this defense, it would have altered the way it conducted discovery. Specifically, Plaintiff would have deposed Sumitomo personnel [FN10] on the issue of whether, based on the specifications given in Harris' patents, they would know how to cure the rubber and whether undue experimentation would be necessary to carry out the best mode. Additionally, Plaintiff would have deposed two inventors of the print rubber formula used by Harris, both of whom work for American Roller, to determine whether they knew of a better curative and whether they hid that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 8
1996 WL 680243 (N.D.Ill.), 42 U.S.P.Q.2d 1369
**(Cite as: 1996 WL 680243 (N.D.Ill.))**

curative.

> FN10.  Sumitomo, a Japanese Corporation, was responsible for the formulation and manufacture of the rubber print layer used by Mitsubishi in the presses which Harris alleges are infringing on its patents.

The above information is highly relevant for two reasons. First, to prevail on its "best mode" defense, Mitsubishi must show by clear and convincing evidence that the co-inventors "knew of and concealed a better mode of carrying out the claimed invention than was set forth in the specifications." *Minco, Inc. v. Combustion Eng'g,* 1996 WL 511532 at *5 (Fed. Cir. 1996). Consequently, the inventors' intent controls the outcome of this issue. *Glaxo Inc. v. Novopharm Ltd., 52 F.3d 1043, 1050 (Fed. Cir.), cert. denied, 116 S. Ct. 516 (1995).* It was therefore critical for Harris to depose the two inventors from American Roller to ascertain their knowledge and intent with respect to this issue in order to prepare to refute this defense at trial.

Additionally, to prevail on its best mode defense, Mitsubishi must show that Harris' use of the phrase "proprietary curative in nitrite polymer" prevents one skilled in the art from practicing the best mode. The best mode disclosure requirement is satisfied when patentees disclose the best mode contemplated by the inventor in carrying out the invention. [FN11] *Glaxo Inc. v. Novopharm Ltd., 52 F.3d 1043, 1050 (Fed. Cir. 1995).* Consequently, disclosure of the preferred embodiment must be sufficiently specific to enable one skilled in the art to practice what the inventors believed to be the best mode. *Glaxo, 52 F.3d at 1055.* The disclosure is sufficiently specific if one skilled in the art could practice the best mode, as described in the patent, without undue experimentation. Therefore, Harris' ability to depose Sumitomo personnel, who represent persons skilled in the art, on the issue of whether, based on the specifications given in Harris' patents, they would know how to cure the printing rubber and whether undue experimentation would be necessary to carry out the best mode as provided in the specifications was important to Harris' ability to respond to the Defendants' claims at trial.

> FN11.  This requirement is intended to prevent inventors from concealing, intentionally or unintentionally, the preferred embodiment of the invention while at the same time, obtaining a patent which confers the right to exclude others from

practicing the invention. *Spectra-Physics, Inc. v. Coherent, Inc., 827 F.2d 1524, 1532 (Fed. Cir. 1987).*

**\*10** Plaintiff cannot now go back and depose the two American Roller inventors, nor, it contends, can it afford the expense of flying to Japan yet again to depose Sumitomo personnel. In fact, Plaintiff did not question a single witness on this subject in any of its depositions and is being denied the opportunity to do so now because fact discovery has closed. Additionally, Plaintiff contends that it would have modified its questioning of Mitsubishi witnesses and would have prepared its own witnesses differently had it been aware of the Defendants' intention to assert a Section 112 defense and of the basis of that defense.

This Court finds that, based on the above considerations, the Plaintiff has been denied the opportunity to conduct any discovery on the issue of the best mode defense and has therefore been prejudiced by the Defendants' failure to timely supplement their interrogatory responses prior to the close of fact discovery. The Court therefore grants the Plaintiff's motion *in limine* and precludes the Defendants from introducing any evidence concerning the Defendants' Section 112 "best mode" defense at trial.

1996 WL 680243 (N.D.Ill.), 42 U.S.P.Q.2d 1369

**Motions, Pleadings and Filings (Back to top)**

• 1:95CV00673                         (Docket) (Feb. 02, 1995)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.